987 A.2d 18

**Norman A. LOCKSHIN, M.D., P.A., et al.**

v.

**Barbara S. SEMSKER, individually and as
personal representative of the estate
of Richard H. Semsker, et al.**

**No. 78 Sept.Term, 2009.**

Court of Appeals of Maryland.

Jan. 12, 2010.

260

James L. Shea (Mitchell Y. Mirviss and Michael J. De Vinne of Venable, LLP, Baltimore, MD; David A. Levin and Thomas C. Marriner of Wharton, Levin, Ehrmantraut & Klein, P.A., Annapolis, MD), on brief, for Appellants.

Brief of Amicus Curiae, The American Ins. Ass'n, in support of Appellants: Robert E. Scott, Jr., Esquire, Paul N. Farquharson, Esquire, Semmes, Bowen & Semmes, Baltimore, MD.

Brief of Amici Curiae, University of Maryland Medical System, Johns Hopkins Health System, Medstar Health, and Lifebridge Health, Inc. in support of Appellants/Cross-Petitioners Norman Lockshin, et al.: Mark D. Gately, Esquire, Hogan & Hartson, LLP, Baltimore, MD; Jessica L. Ellsworth, Esquire, Hogan & Hartson, LLP, Washington, DC, of counsel.

Brief of The Maryland Hosp. Ass'n, Inc. Amicus Curiae in support of Appellants: Jerome G. Geraghty, Esquire, Alexan-

der Chizhik, Esquire, Blades & Rosenfeld, P.A., Baltimore, MD.

Brief of Amici Curiae in support of Appellants, The Medical and Chirurgical Faculty of Maryland, Inc. t/a The Maryland State Medical Society and The American Medical Ass'n: Stephen H. Johnson, Esquire, Gen. Counsel, The Maryland State Medical Society, Baltimore, MD; Joseph A. Schwartz, III, Esquire, Pamela Metz Kasemeyer, Esquire, J. Steven Wise, Esquire, Schwartz, Metz & Wise, P.A., Baltimore, MD.

Brief of Amicus Curiae, NFIB Small Business Legal Center in support of Defendants-Appellants: Elizabeth Gaudio, Esquire, Nat. Federation of Independent Business, Washington, DC.

Brief of Amicus Curiae, Maryland Defense Counsel: K. Nichole Nesbitt, Esquire, Kelly Hughes Iverson, Esquire, Goodell, DeVries, Leech & Dann, LLP, Baltimore, MD.

Patrick A. Malone (Leonard W. Dooren of Patrick Malone & Associates, PC, Washington, DC; Ned Miltenberg of Center for Constitutional Litigation, PC, Washington, DC; Jonathan L. Thornton of Pierce & Thornton, PLC, Norfolk, VA, of counsel), on brief, for Appellees.

Brief of Amicus Curiae, Maryland Ass'n for Justice: George S. Tolley, III, Esquire, Dugan, Babij & Tolley, LLC, Timonium, MD; David M. Kopstein, Esquire, Seabrook, MD.

Brief of Amicus Curiae, Progressive Maryland in support of Appellees/Petitioners: Wayne M. Willoughby, Esquire, Gershon, Willoughby, Gertz & Smith, LLC, Baltimore, MD.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, Judge.

The Circuit Court for Montgomery County held in this litigation, among other things, that the plain meaning of Md.Code, Courts & Judicial Proceedings Article[1] § 3–2A–

---

1. All citations to the Maryland Code contained herein refer to the Courts and Judicial Proceedings Article, unless otherwise noted.

09(a) (1974, 2006 Repl.Vol.), which states that the monetary cap on non-economic damages for health care malpractice claims appearing in § 3–2A–09(b) applies "to an award under § 3–2A–05 of this subtitle or a verdict under § 3–2A–06 of this subtitle," is that the cap is inapplicable to claims for which arbitration is waived pursuant to §§ 3–2A–06A or 3–2A–06B. The latter provisions provide the procedures for mutual and unilateral waiver of arbitration, respectively. Appellants/Cross–Petitioners (Norman A. Lockshin, M.D., P.A., and Dr. Michael Albert) urge this Court to reach a different conclusion under the plain meaning of the statute or, alternatively, to find ambiguity in the language of § 3–2A–09(a) and to examine the legislative history of the statute, which they maintain supports the conclusion that the General Assembly intended the non-economic damages cap to apply to all health care malpractice claims, not just those are arbitrated. Appellees/Petitioners (the Estate of Richard H. Semsker, Barbara S. Semsker, Meryl Semsker, and Julia Semsker), on the other hand, maintain that the Circuit Court correctly determined the plain meaning of § 3–2A–09(a). For reasons we shall explain, although we agree with the Circuit Court's conclusion that the language in § 3–2A–09(a) is plain, unlike the Circuit Court, we hold that the plain meaning of that language provides that the cap on non-economic damages applies to all health care malpractice claims, including those, like the present case, for which arbitration has been waived under § 3–2A–06B.

## I. The Statutory Scheme Governing Health Care Malpractice Claims

As it illuminates and informs our later analysis, it is desirable to frame early in this opinion the relevant statutory scheme in which the question at hand is enmeshed.

Subtitle 3–2A of the Courts and Judicial Proceedings Article governs nearly all claims brought by plaintiffs against health care providers for medical injuries alleged to have been suffered by the plaintiffs at the hands of the providers. § 3–2A–02(a)(1). The subtitle establishes the Health Care Alternative

Dispute Resolution Office (the "HCADRO") and empowers it to create panels consisting of attorneys, health care providers, and members of the public to serve, prior to litigation, as arbiters of health care malpractice claims. §§ 3–2A–03 (a) and (c). Under this arbitration scheme, a plaintiff must file initially his or her claim, along with a certificate of a qualified expert attesting to the alleged departure by the defendant(s) from standards of care and causation of the plaintiff's injury by such departure, with the Director of the HCADRO, who then refers the claim to an arbitration panel. §§ 3–2A–04(a)(1)(i), –04(b)(1)(i), and –05(a)(1). The arbitration panel reviews pertinent documents, takes testimony from the parties and their respective experts, determines the liability of the defendant or defendants, if any,[2] assesses costs of the arbitration, and issues an award. § 3–2A–05(b)–(f). Following the panel's award determination, any party may apply to the arbitration panel to modify or correct its award as to liability, damages, or costs. § 3–2A–05(h).

Under § 3–2A–06(a), a party "may reject an award or the assessment of costs under an award for any reason" by notifying the Director, the arbitration panel, and the other parties to the dispute, and by filing an action in the Circuit Court to nullify the award or assessment of costs. §§ 3–2A–06(a) and (b)(1). Upon proper rejection of the arbitration

---

**2.** Section 3–2A–05(e), entitled "Determinations," provides:

(1) The arbitration panel shall first determine the issue of liability with respect to a claim referred to it.

(2) If the arbitration panel determines that the health care provider is not liable to the claimant or claimants the award shall be in favor of the health care provider.

(3) If the arbitration panel determines that a health care provider is liable to the claimant or claimants, it shall then consider, itemize, assess, and apportion appropriate damages against one or more of the health care providers that it has found to be liable.

(4) The award shall itemize by category and amount any damages assessed for incurred medical expenses, rehabilitation costs, and loss of earnings. Damages assessed for any future expenses, costs, and losses shall be itemized separately.

§ 3–2A–05(e).

panel's award, any party may elect to have the case tried by a jury in the Circuit Court; if no party elects timely a trial by jury, the case is heard before a judge. § 3–2A–06(b)(2).

At the close of the trial and upon timely request, the trier of fact "shall by special verdict or specific findings itemize by category and amount any damages assessed for incurred medical expenses, rehabilitation costs, and loss of earnings." § 3–2A–06(f)(1).[3] The special verdict shall itemize separately any damages for any future expenses, costs, and losses. *Id.* If a verdict includes any such itemized damages for expenses, costs, and losses, "a party may object to the damages as

---

3. Section 3–2A–06(f), entitled "Itemization of certain damages; remittur," provides:

(1) Upon timely request, the trier of fact shall by special verdict or specific findings itemize by category and amount any damages assessed for incurred medical expenses, rehabilitation costs, and loss of earnings. Damages assessed for any future expenses, costs, and losses shall be itemized separately. If the verdict or findings include any amount for such expenses, costs, and losses, a party filing a motion for a new trial may object to the damages as excessive on the ground that the plaintiff has been or will be paid, reimbursed, or indemnified to the extent and subject to the limits stated in § 3–2A–05(h) of this subtitle.

(2) The court shall hold a hearing and receive evidence on the objection.

(3)(i) If the court finds from the evidence that the damages are excessive on the grounds stated in § 3–2A–05(h) of this subtitle, subject to the limits and conditions stated in § 3–2A–05(h) of this subtitle, it may grant a new trial as to such damages or may deny a new trial if the plaintiff agrees to a remittur of the excess and the order required adequate security when warranted by the conditions stated in § 3–2A–05(h) of this subtitle.

(ii) In the event of a new trial granted under this subsection, evidence considered by the court in granting the remittur shall be admissible if offered at the new trial and the jury shall be instructed to consider such evidence in reaching its verdict as to damages.

(iii) Upon a determination of those damages at the new trial, no further objection to damages may be made exclusive of any party's right to appeal.

(4) Except as expressly provided by federal law, no person may recover from the plaintiff or assert a claim of subrogation against a defendant for any sum included in a remittur or awarded in a new trial on damages granted under this subsection.

(5) Nothing in this subsection shall be construed to otherwise limit the common law grounds for remittur.

§ 3–2A–06(f).

excessive on the ground that the plaintiff has been or will be paid, reimbursed, or indemnified to the extent and subject to the limits stated in § 3–2A–05(h). . . ."[4] *Id.* If, after reception of evidence on the objection at a hearing, the court finds that the damages are excessive on the grounds stated in § 3–2A–05(h), it may grant a new trial as to such damages or may deny a new trial if the plaintiff agrees to a remittur of the excess. § 3–2A–06(f)(3)(i).

---

4. Section 3–2A–05(h), entitled "Application for modification or correction; request for reduction of damages," provides:

(1) A party may apply to the arbitration panel to modify or correct an award as to liability, damages, or costs in accordance with § 3–222 of this title.

(2)(i) The application may include a request that damages be reduced to the extent that the claimant has been or will be paid, reimbursed, or indemnified under statute, insurance, or contract for all or part of the damages assessed.

(ii) The panel chairman shall receive such evidence in support and opposition to a request for reduction, including evidence of the cost to obtain such payment, reimbursement, or indemnity.

(iii) After hearing the evidence in support and opposition to the request, the panel chairman may modify the award if satisfied that modification is supported by the evidence.

(iv) The award may not be modified as to any sums paid or payable to a claimant under any workers' compensation act, criminal injuries compensation act, employee benefit plan established under a collective bargaining agreement between an employer and an employee or a group of employers and a group of employees that is subject to the provisions of the federal Employee Retirement Income Security Act of 1974, program of the Department of Health and Mental Hygiene for which a right of subrogation—exists under §§ 15–120 and 15–121.1 of the Health–General Article, or as a benefit under any contract or policy of life insurance or Social Security Act of the United States.

(v) An award may not be modified as to any damages assessed for any future expenses, costs, and losses unless:

1. The panel chairman orders the defendant or the defendant's insurer to provide adequate security; or

2. The insurer is authorized to do business in this State and maintains reserves in compliance with rules of the Insurance Commissioner to assure the payment of all such future damages up to the amount by which the award has been modified as to such future damages in the event of termination.

(vi) Except as expressly provided by federal law, no person may recover from the claimant or assert a claim of subrogation against a defendant for any sum included in the modification of an award.

§ 3–2A–05(h).

The arbitration process, however, may be avoided in the main. Under § 3–2A–06A, at any time prior to the hearing of a claim by the HCADRO, the parties "may agree mutually to waive arbitration of the claim." § 3–2A–06A(a). If the parties so agree, "the provisions of [§ 3–2A–06A] then shall govern all further proceedings on the claim." *Id.* Where a case is subject to the provisions of § 3–2A–06A based on mutual waiver of arbitration, the statute provides that "the procedures of § 3–2A–06(f) of this subtitle shall apply." § 3–2A–06A(e).

In addition to mutual waiver under § 3–2A–06A, arbitration of a claim through the HCADRO "may be waived by the claimant or any defendant in accordance with" § 3–2A–06B after the filing of the certificate of qualified expert required by § 3–2A–04(b). §§ 3–2A–06B(a) and (b)(1). If arbitration is waived unilaterally in this fashion, "the provisions of [§ 3–2A–06B] shall govern all further proceedings on any claim . . . ." § 3–2A–06B(a). As with mutual waiver of arbitration under § 3–2A–06A, where a case is waived unilaterally out of arbitration, the statute provides that "the procedures of § 3–2A–06(f) of this subtitle shall apply." § 3–2A–06B(h).

Of particular importance to the present case, § 3–2A–09, entitled "Limitation of noneconomic damages," provides a cap on non-economic damages applicable "to an award under § 3–2A–05 of this subtitle or a verdict under § 3–2A–06 of this subtitle for a cause of action arising on or after January 1, 2005." § 3–2A–09(a). Subsection (b) establishes the amount of the cap, stating that "an award or verdict under this subtitle for noneconomic damages for a cause of action arising between January 1, 2005, and December 31, 2008, inclusive, may not exceed $650,000." § 3–2A–09(b)(1)(i). The limitation on non-economic damages contained in § 3–2A–09(b)(1)(i) increases by $15,000 yearly, beginning on 1 January 2009. § 3–2A–09(b)(1)(ii). In general, the cap applies "in the aggregate to all claims for personal injury and wrongful death arising from the same medical injury, regardless of the number of claims, claimants, plaintiffs, beneficiaries, or defendants." § 3–2A–09(b)(2)(i). The statute further provides that, where

"there is a wrongful death action in which there are two or more claimants or beneficiaries, whether or not there is a personal injury action arising from the same medical injury, the total amount awarded for noneconomic damages for all actions may not exceed 125% of the limitation established under paragraph (1) of this subsection, regardless of the number of claims, claimants, plaintiffs, beneficiaries, or defendants." § 3–2A–09(b)(2)(ii).

Regarding the limitation on non-economic damages, § 3–2A–09 states that a jury "may not be informed of the limitation under" § 3–2A–09(b). § 3–2A–09(c)(1). If the jury awards an amount for non-economic damages exceeding the limitation, the statute provides that "the court shall reduce the amount to conform to the limitation." § 3–2A–09(c)(2). In a case in which there is a personal injury action and a wrongful death action, "if the total amount awarded by the jury for noneconomic damages for both actions exceeds the limitation under [§ 3–2A–09(b)], the court shall reduce the award in each action proportionately so that the total award for noneconomic damages for both actions conforms to the limitation." § 3–2A–09(c)(4). Lastly, § 3–2A–09(d) provides that a "verdict for past medical expenses shall be limited to: (i) [t]he total amount of past medical expenses paid by or on behalf of the plaintiff; and (ii) [t]he total amount of past medical expenses incurred but not paid by or on behalf of the plaintiff for which the plaintiff or another person on behalf of the plaintiff is obligated to pay." § 3–2A–09(d)(1).

## II. The Present Case

In late 1998, Richard H. Semsker, a 44–year–old Rockville attorney, visited the dermatology offices of Norman A. Lockshin, M.D., P.A. ("Lockshin, P.A."), a medical group operating under the trade name Derm Associates, P.C., in Silver Spring, upon referral from his internist, Dr. Lawrence Marcus. Semsker was seen by Dr. Norman A. Lockshin, who removed a cyst and wrote to Dr. Marcus that Semsker had a dark brown 6 millimeter nevus [5] on his back that should be excised.

---

5. A "nevus" is "[a] circumscribed malformation of the skin, especially if colored by hyperpigmentation or increased vascularity." *PDR Medical Dictionary* 1208 (1st ed. 1995).

According to Semsker, neither Dr. Marcus nor Dr. Lockshin informed him of the presence of the nevus.

In September 2004, Semsker returned to Lockshin, P.A. to have cysts on his upper back examined and to undergo a full body skin check. He was examined by Dr. Michael Albert, a dermatologist employed by Lockshin, P.A., who documented two benign cysts, an atypical nevus on Semsker's upper right back, and a 1.3 centimeter congenital nevus on his lower back (the same nevus that had grown from 6 millimeters when Dr. Lockshin examined it in 1998). Dr. Albert recommended removal of the cysts and the atypical nevus, but recommended only regular monitoring of the congenital nevus, rather than its removal. As recommended, the upper-back cysts and atypical nevus were removed.

On 3 August 2006, shortly after Semsker's wife, Barbara, noticed that the nevus Dr. Albert had not recommended be removed had changed color, Semsker returned to Lockshin, P.A., where the nevus was excised by Dr. Benjamin Lockshin. Shortly afterward, it was determined that the nevus had turned into a malignant melanoma which had metastasized to dozens of lymph nodes in Semsker's groin and lower abdomen. Radiation and other treatment failed to halt further metastasis.

On 30 March 2007, Semsker and his wife filed with the Director of the HCADRO a claim under § 3–2A–04(a)(1)(i) for medical malpractice against Dr. Albert (Semsker's dermatologist); Lockshin, P.A. under its business name Derm Associates, P.C. (Dr. Albert's employer); Dr. Norman Lockshin; Dr. Kendall Hash (another employee of Lockshin, P.A.); and Dr. Marcus (Semsker's internist), alleging misdiagnosis of his cancer. Mr. and Mrs. Semsker elected to waive arbitration pursuant to § 3–2A–06B(b)(1) on 19 June 2007, and, one day later, filed in the Circuit Court for Montgomery County a complaint for medical malpractice. In the plaintiffs' Joint Pretrial Statement and a Supplement thereto, it was stipulated that they were claiming "the maximum allowable" under the non-economic damages cap, "which is $812,500." [6]

---

**6.** Under § 3–2A–09(b)(2), the then current limit for recovery of non-economic damages in a wrongful death health care malpractice case with multiple claimants was $812,500. § 3–2A–09(b)(2).

On 15 October 2007, while the case was pending in the Circuit Court, Semsker passed away due to his cancer. On 19 December 2007, Mrs. Semsker filed a Second Amended Complaint, converting the case to a wrongful death and survival action on behalf of Semsker's estate (for which she is the personal representative) and adding the Semskers' two adult daughters, Meryl and Julia Semsker, as plaintiffs. Prior to trial, the remaining Semskers dismissed voluntarily and with prejudice all claims against Dr. Hash.

The trial was conducted before a jury beginning on 3 November 2008. At trial, the Semskers introduced, without objection, evidence of $415,781 in incurred medical expenses.[7]

On the final day of trial, following the conclusion of the evidence, the Semskers reached a joint tortfeasor settlement with Dr. Marcus in the amount of $1 million and granted Dr. Marcus a standard non-*Swigert* joint tortfeasor release.[8] The purpose of the joint tortfeasor release was to provide an automatic credit to any non-settling defendants who were held liable ultimately to the Semskers in the present case, thus protecting Dr. Marcus from all future claims against him for contribution from non-settling joint tortfeasors. The release described the credit as "an automatic reduction of any future verdict or judgment against any non-settling tortfeasor" of "all

---

7. The Semskers admit that, of the $415,781 for incurred medical expenses, they and their insurers paid only $335,568.15. Thus, according to the Semskers, the total "write-off," calculated as the difference between the incurred bills and the amounts actually paid by all sources, was $80,213. Appellants/Cross–Petitioners, on the other hand, maintain that the write-offs by Semsker's health care providers totaled more than $200,000. The Semskers dispute that contention, arguing that the Physicians assume erroneously that the insurance subrogation lien of $218,396 included all bills paid by insurance and that, in fact, the insurers paid $112,572 in pharmacy bills for Semsker which were not part of the subrogation lien. No fact-finder has determined yet the amount of any write-offs.

8. A "non-*Swigert*" release, referring to our decision in *Swigert v. Welk*, 213 Md. 613, 133 A.2d 428 (1957), establishes joint tortfeasor status of the settling defendant and requires the plaintiff to credit against a judgment the greater of the settlement amount or a pro rata share of the judgment.

damages ... recoverable" by the Semskers "to the extent of the *pro rata* share[ ] of [Dr. Marcus] or *pro tanto,* whichever is greater."

On 14 November 2008, the jury returned a special verdict in favor of the Semskers, finding Dr. Albert liable individually for medical malpractice. In its verdict, the jury awarded the Semskers $5,805,000 in compensatory damages, which included a total of $3 million in non-economic damages, allocated as follows: $1 million to Semsker's estate, $1 million to Mrs. Semsker, and $500,000 to each of the Semskers' daughters.[9] The verdict was applied by stipulation to Dr. Albert's employer, Lockshin, P.A., on a *respondeat superior* basis.[10]

On 18 November 2008, the Semskers moved the Circuit Court for entry of judgment on the entire jury verdict, specifically requesting that the court not apply the § 3–2A–09 cap on non-economic damages. The court entered judgment on the jury verdict on 19 November 2008. Subsequently, the defendants found liable by the jury, Dr. Albert and Lockshin, P.A. (collectively "the Physicians"), urged the court in a timely motion to apply the cap on non-economic damages contained in § 3–2A–09(b) to the verdict, to reduce the award for past medical expenses to account for those expenses that had been written off, and to conform the verdict to the evidence. The court, in that moment being of the view that the cap on non-economic damages applied to the case, reduced the cumulative non-economic damages by the sum of $2,177,500, *i.e.,* from $3 million to a total of $812,500, the cap limit for non-economic damages in wrongful death health care malpractice cases with multiple claimants, and entered revised judgments on that amount on 26 November 2008.[11] The court also reduced the

---

**9.** The jury also awarded economic damages in the amount of $2 million to Mrs. Semsker for loss of financial support, $300,000 to Mrs. Semsker for loss of household services, $500,000 to Semsker's estate for past medical expenses, and $5,000 to the estate for funeral expenses.

**10.** The jury found Dr. Norman A. Lockshin, the owner of the professional association bearing his name, not liable to the Semskers.

**11.** As the result of the 26 November reductions, the judgment for non-economic damages was as follows: $270,833.34 to Semsker's estate,

award for past medical expenses from $500,000 to $415,871 in order to conform to the evidence presented at trial.

The Semskers moved the Circuit Court, on 1 December 2008, to alter or amend the judgment, arguing that the cap on non-economic damages did not apply to unarbitrated claims. The Physicians filed motions requesting a new trial, remittur, and revision of the judgments based on application of the pro rata reduction called for by the release between the Semskers and Dr. Marcus. On 20 April 2009, the Circuit Court issued an order and opinion holding that, under the purportedly clear language of § 3–2A–09(a), the cap on non-economic damages contained in § 3–2A–09 did not apply to the present case because it involved an unarbitrated claim, denying the Physicians' motion for a new trial or remittur, and revising the judgment to reflect Dr. Marcus's pro rata joint tortfeasor contribution. In addition, the court, assuming hypothetically that the cap applied to unarbitrated claims, held that any pro rata reduction based on the joint tortfeasor settlement should be calculated prior to application of the cap, and that the Semskers could recover for past medical expenses that had been written off by Mr. Semsker's health care providers due to the Physicians' failure to adduce at trial any evidence of such "write-offs." On 24 April 2009, the Circuit Court entered four judgments [12] in favor of the Semskers, in accordance with its 20 April order and opinion, effectively reinstating the amount of the award granted by the jury in its special verdict.[13]

The Semskers and the Physicians petitioned this Court for a writ of certiorari, prior to final action on an appeal to the

---

$270,833.34 to Mrs. Semsker, and $135,416.66 to each of the Semskers' two daughters. Thus, at this point, the total awards were: $2,570,833.34 to Mrs. Semsker, $135,416.66 to each of the Semskers' daughters, and $691,614.64 to Semsker's estate.

12. The judgments were revised, by the parties' consent, on 5 June 2009.

13. Following its action on the parties' motions, the court noted judgments in the amount of $1,650,000 to Mrs. Semsker, $250,000 to each of the Semskers' daughters, and $710,436 to the estate.

Court of Special Appeals. We granted their petitions, 409 Md. 413, 975 A.2d 875 (2009), to consider the following questions:

(1) Whether the Circuit Court erred in holding that the cap on non-economic damages in health care malpractice claims contained in § 3–2A–09 does not apply to health care malpractice claims in which arbitration has been waived under §§ 3–2A–06A or 3–2A–06B?

(2) Whether the Circuit Court erred in holding that, if the cap does apply to claims in which arbitration has been waived, the court should apply a pro rata joint tortfeasor reduction prior to applying the limitation on non-economic damages?

(3) Whether the Circuit Court erred in holding that § 3–2A–09(d)(1) does not mandate a reduction of the verdict to exclude past medical expenses that were not, and will not be paid by or on behalf of, the patient, where the Physicians failed to offer evidence of those expenses at trial?

As the issues are solely questions of statutory interpretation, and, thus, questions of law, our review is non-deferential. *See Harvey v. Marshall,* 389 Md. 243, 257, 884 A.2d 1171, 1179 (2005); *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004); *Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 310, 799 A.2d 1264, 1267 (2002).

### III. Applicability of the Cap to Unarbitrated Health Care Malpractice Claims

Basing its decision on what it believed to be the plain meaning of § 3–2A–09(a), the Circuit Court held that the non-economic damages cap of § 3–2A–09 did not apply to the present unarbitrated case because § 3–2A–09(a), which states that the cap is applicable to awards under § 3–2A–05 and verdicts under § 3–2A–06, makes no reference to §§ 3–2A–06A or 3–2A–06B, the "separate and distinct" sections governing waiver of arbitration. Although finding the language in § 3–2A–09(a) plain in its meaning, the trial court nevertheless reviewed the purpose and legislative history of § 3–2A–09(a), concluding (1) that its interpretation of § 3–2A–09(a) did not

conflict with the statute's purpose paragraph [14] because the statute as interpreted "does impose a single restriction on awards applicable to both wrongful death and survival actions in certain medical malpractice claims," and (2) that applying the cap to unarbitrated claims would "essentially reinstate the language of § 3–2A–09 that was specifically deleted and amended by the General Assembly when it enacted the final version of the bill." [15] We agree with the Circuit Court that the language of § 3–2A–09(a) is plain. For reasons we shall explain, however, we disagree as to the plain meaning of that language and hold that the plain meaning of the reference in § 3–2A–09(a) to "a verdict under § 3–2A–06" includes verdicts in cases that arrive in a Maryland courthouse following a waiver of arbitration pursuant to §§ 3–2A–06A or 3–2A–06B.

## A. Pertinent Principles of Sound Statutory Construction

▉▉▉ The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. *Bd. of Educ. v. Zimmer–Rubert*, 409 Md. 200, 214, 973 A.2d 233, 241 (2009); *In re Najasha B.*, 409 Md. 20, 27, 972 A.2d 845, 849 (2009). A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny. *Anderson v. Council of Unit Owners*, 404 Md. 560, 571, 948

---

14. In pertinent part, the Purpose paragraph of the enacted version of House Bill 2, the Maryland Patients' Access to Quality Health Care Act of 2004, states that the bill was intended for the purpose of:

 ... altering certain limitations on noneconomic damages for health care malpractice actions; establishing a single limitation on noneconomic damages for a survival action and a wrongful death action concerning health care malpractice; prohibiting a jury from being informed of certain limitations on noneconomic damages; requiring that an award or verdict of economic damages for a medical injury exclude certain amounts for past medical expenses ...

 2004 Md. Laws (Spec.Sess.), ch. 5, at 29.

15. During the first and second readings of House Bill 2, the proposed language of § 3–2A–09(a) provided:

 "This section applies to a judgment under this subtitle for a cause of action arising on or after January 1, 2005."

A.2d 11, 18 (2008); *People's Ins. Counsel Div. v. Allstate Ins. Co.*, 408 Md. 336, 351, 969 A.2d 971, 979–80 (2009); *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007); *Gen. Motors Corp. v. Seay*, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005).

■ To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. *Zimmer–Rubert*, 409 Md. at 214, 973 A.2d at 241; *Allstate*, 408 Md. at 351, 969 A.2d at 980; *Anderson*, 404 Md. at 571, 948 A.2d at 18; *Allen v. State*, 402 Md. 59, 76, 935 A.2d 421, 431 (2007); *Barbre*, 402 Md. at 172, 935 A.2d at 708; *Kelly*, 397 Md. at 420, 918 A.2d at 482. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. *Zimmer–Rubert*, 409 Md. at 214–15, 973 A.2d at 241–42; *In re Najasha B.*, 409 Md. at 27, 972 A.2d at 849; *Allstate*, 408 Md. at 351, 969 A.2d at 980; *Anderson*, 404 Md. at 572, 948 A.2d at 19; *Barbre*, 402 Md. at 174, 935 A.2d at 708–09; *Kelly*, 397 Md. at 419, 918 A.2d at 482. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application. *Lonaconing Trap Club, Inc. v. Dep't of Env't*, 410 Md. 326, 339, 978 A.2d 702, 709 (2009); *Liverpool*, 369 Md. at 316–17, 799 A.2d at 1271 (2002); *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93, 105 (1994); *Amal. Cas. Ins. Co. v. Helms*, 239 Md. 529, 535, 212 A.2d 311, 316 (1965).

■ We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. *Anderson*, 404 Md. at 572, 948 A.2d at 19; *Drew v. First Guar. Mort. Corp.*, 379 Md. 318, 327, 842 A.2d 1, 6 (2003); *Blondell v. Balt. City Police Dep't*, 341 Md. 680, 691, 672 A.2d 639, 645 (1996); *Comptroller v. John C. Louis Co.*, 285 Md.

527, 538, 404 A.2d 1045, 1052–53 (1979). Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. *Anderson*, 404 Md. at 572, 948 A.2d at 19; *Comptroller v. Phillips*, 384 Md. 583, 591, 865 A.2d 590, 594 (2005); *Harvey*, 389 Md. at 290, 884 A.2d at 1199; *Blondell*, 341 Md. at 691, 672 A.2d at 645. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope. *Harvey*, 389 Md. at 290, 884 A.2d at 1199; *Liverpool*, 369 Md. at 316–17, 799 A.2d at 1271; *Curran*, 334 Md. at 172, 638 A.2d at 104; *John C. Louis Co.*, 285 Md. at 538–39, 404 A.2d at 1053.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. *In re Najasha B.*, 409 Md. at 27, 972 A.2d at 849; *Allstate*, 408 Md. at 351, 969 A.2d at 979–80; *Anderson*, 404 Md. at 572, 948 A.2d at 19; *Barbre*, 402 Md. at 173, 935 A.2d at 709; *Kelly*, 397 Md. at 419–20, 918 A.2d at 482. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions. *In re Najasha B.*, 409 Md. at 27, 972 A.2d at 849; *Liverpool*, 369 Md. at 316–17, 799 A.2d at 1271; *Chesapeake Charter, Inc. v. Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625, 628 (2000); *Curran*, 334 Md. at 172, 638 A.2d at 104.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense. *Zimmer–Rubert*, 409 Md. at 214, 973

A.2d at 241; *Anderson*, 404 Md. at 571, 948 A.2d at 18; *Barbre*, 402 Md. at 172, 935 A.2d at 708.

## B. What is the Plain Meaning of § 3–2A–09(a)?

■ Section 3–2A–09(a) provides that the non-economic damages cap for health care malpractice claims is applicable "to an award under § 3–2A–05 of this subtitle or a verdict under § 3–2A–06 of this subtitle." § 3–2A–09(a). Subsection (a) makes no mention of § 3–2A–06A or § 3–2A–06B, the sections governing the procedures for waiving arbitration. The Semskers contend, and the Circuit Court found, that the omission of such mention from subsection (a) of the arbitration provisions of §§ 3–2A–06A and 3–2A–06B must mean that, where arbitration has been waived, the cap on non-economic damages does not apply. They are mistaken.

A health care malpractice claim may arrive in a Maryland circuit court in four distinct ways. First, the claim may be fully arbitrated under the procedures of § 3–2A–05 and require nothing more from the court than confirmation of the award. § 3–2A–05. Alternatively, under § 3–2A–06, the claim may proceed through the arbitration procedures of § 3–2A–05, the award may be rejected by one of the parties in accordance with § 3–2A–06(a), and the rejecting party may file an action in a circuit court to nullify the award and proceed to trial. §§ 3–2A–06(a) and (b). The third and fourth avenues into court for a health care malpractice claim are through waiver of arbitration under §§ 3–2A–06A or 3–2A–06B, either mutually by both sides or unilaterally by the plaintiff or any defendant, respectively, and the filing of a claim in a circuit court.

It is obvious that a claim following the first path, full arbitration under § 3–2A–05, will result in "an award under § 3–2A–05 of this subtitle," and the cap on non-economic damages contained in § 3–2A–09 will apply. It is equally clear and undisputed that, where an arbitration award issues and a party rejects the award under § 3–2A–06(a), electing instead to proceed to trial on the claim, the resulting verdict

constitutes "a verdict under § 3–2A–06" and the cap is applicable. The question we must resolve in this case is whether the reference in § 3–2A–09(a) to "a verdict under § 3–2A–06 of this subtitle" encompasses resultant verdicts reached via the other two avenues for resolution of health care malpractice claims, namely, those resulting from cases that arrive in court following either mutual or unilateral waiver of arbitration under §§ 3–2A–06A or 3–2A–06B, respectively.

Sections 3–2A–06A and 3–2A–06B address solely the procedures for waiving arbitration in health care malpractice claims. Due to their limited scope in outlining the procedures for waiving arbitration, the sections make no mention of verdicts, nor do they address court procedures following waiver of arbitration. Both sections, however, provide explicitly that, "[i]n any case subject to this section, the procedures of § 3–2A–06(f) of this subtitle shall apply." §§ 3–2A–06A(e) and 3–2A–06B(h). Thus, where a case has been waived properly out of arbitration under §§ 3–2A–06A or 3–2A–06B and proceeds to trial in a circuit court, the claim is subject to the procedures of § 3–2A–06(f), which provides for itemization of the jury's verdict into specific categories, the filing of an objection to the jury's verdict based on its excessive nature, and the court's consideration and resolution of any objection. § 3–2A–06(f).

It is clear that, if a verdict is returned under the procedures of § 3–2A–06(f), it constitutes "a verdict under § 3–2A–06 of this subtitle." Despite the Circuit Court's reasoning and the Semskers' argument that the verdict obtained in the present case was "a verdict under § 3–2A–06B," there can be no such verdict; where arbitration is waived, according to the specific commands of §§ 3–2A–06A(e) and 3–2A–06B(h), the only verdict in a health care malpractice case is one obtained in accordance with the procedures of § 3–2A–06(f) and, thus, "a verdict under § 3–2A–06 of this subtitle." Regardless of whether the verdict comes after rejection of an arbitration award or waiver of arbitration, it is "a verdict under § 3–2A–06 of this subtitle" and is subject to the cap provided for in § 3–2A–09.

Our conclusion that the reference in § 3–2A–09(a) to "a verdict under 3–2A–06" includes verdicts in cases where arbitration is waived in accordance with §§ 3–2A–06A or 3–2A–06B is reinforced by the language of the subsection that follows, § 3–2A–09(b). That subsection states that "an award or verdict under this subtitle for non-economic damages for a cause of action arising between January 1, 2005, and December 31, 2008, inclusive, may not exceed $650,000." § 3–2A–09(b). By reference to the entirety of subtitle 3–2A, subsection (b) contemplates a cap on all non-economic damage awards and verdicts in health care malpractice cases, including those brought under §§ 3–2A–05, –06, –06A, and –06B, regardless of their derivation. Thus, the language of subsection (b) supports our conclusion that the cap on non-economic damages applies to claims for which arbitration is waived under §§ 3–2A–06A or 3–2A–06B.

■ We hold that, based on the plain meaning of § 3–2A–09 and the specific provisions of §§ 3–2A–06A and 3–2A–06B referring to the procedures of § 3–2A–06(f) regarding the issuance of verdicts, the cap on non-economic damages contained in § 3–2A–09(b) applies to all health care malpractice claims, whether they are: (1) arbitrated under § 3–2A–05; (2) arbitrated, but followed by a rejection of the arbitration award under § 3–2A–06; or (3) waived out of arbitration under §§ 3–2A–06A or 3–2A–06B. Thus, the cap on non-economic damages was applicable to the Semskers' claims in the present case.

## C. The Legislative History of § 3–2A–09(a)

■ For the sake of completeness, "we may resort to legislative history to ensure that our plain language interpretation is correct." *Zimmer–Rubert*, 409 Md. at 214, 973 A.2d at 241; *see also Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 983 A.2d 408 (2009) (reviewing legislative history "for the sake of testing the validity of our construction" in the context of statutory interpretation).

The language of § 3–2A–09(a) at issue in this case was enacted by the General Assembly during an emergency special session called by then Governor Robert Ehrlich on 28 December 2004. The bill that emerged from that intense special session, House Bill 2, included the current language of § 3–2A–09(a), stating that the non-economic damages cap applies to "an award under § 3–2A–05 of this subtitle or a verdict under § 3–2A–06 of this subtitle." The initial pertinent language of the bill, as it appeared during the first and second readings in the House of Delegates, however, provided that the cap "applies to a judgment under this subtitle." The Circuit Court, in its analysis, focused on the change in this wording and concluded that the amendment to § 3–2A–09 in the enacted version of House Bill 2 "had the effect of narrowing the ambit of the statute from general application to all medical malpractice actions to application to only certain medical malpractice actions." Thus, the trial court apparently believed the General Assembly had "deliberately and specifically amended" § 3–2A–09(a) to exclude application of the cap to cases for which arbitration had been waived under §§ 3–2A–06A or 3–2A–06B.

There exists, however, a considerably more reasonable interpretation of the purpose behind the General Assembly's change in language from the initial formulation of § 3–2A–09(a) in House Bill 2 and its final enacted version—clarity. Originally, § 3–2A–09(a) purportedly applied the cap on non-economic damages to "judgments." Statutorily-mandated caps, however, should be applied to reduce verdicts, which are issued by juries, rather than "judgments," which are entered by judges. A jury may not be informed of the statutory cap on damages, see § 3–2A–09(c)(1), and, thus, its verdict may exceed the cap and require reduction. Judges, however, are presumed to know the law and do not enter "judgments" in excess of the statutory "caps." As such, the General Assembly altered the language of § 3–2A–09(a) to apply to "an award or a verdict," rather than to "judgments," in order to reflect the distinction between the concepts and clarify that the cap on non-economic damages is applied to the arbitration

award or the jury's verdict, not the judicially-entered final "judgment" in the case. The Circuit Court's belief that the change represented a deliberate decision to remove from the ambit of the cap claims for which arbitration was waived under §§ 3–2A–06A or 3–2A–06B, without any legislative history to suggest that the General Assembly intended such a sea change, requires a considerable leap in reasoning.

In addition, during the special session, the General Assembly added subsection (e) to § 11–108, the general cap on non-economic damages for personal injury actions. 2004 Md. Laws (Spec.Sess.), ch. 5, at 57. Subsection (e) states that "[t]he provisions of this section do not apply to a verdict under Title 3, Subtitle 2A of this article for damages in which the cause of action arises on or after January 1, 2005." § 11–108(e). The amendment removed health care malpractice actions from the ambit of the general non-economic damages cap of § 11–108. If the Circuit Court's interpretation of § 3–2A–09(a) were adopted, no cap would apply to health care malpractice claims for which arbitration is waived under §§ 3–2A–06A or 3–2A–06B, due to the operation of § 11–108(e). Such cases would represent the only personal injury claims singled out for exemption from a cap on non-economic damages. Without any legislative history supporting this interpretation, it would be unreasonable to conclude that the General Assembly, when it clarified the language of § 3–2A–09(a), intended such a result.

As such, the legislative history, although not conclusive, supports our holding that the non-economic damages cap contained in § 3–2A–09 applies to all health care malpractice claims, including those for which arbitration has been waived under §§ 3–2A–06A or 3–2A–06B. The Circuit Court's holding to the contrary was error.

### IV. The Order of Operation of the Cap and Settlement Credit

Out of an abundance of caution, the Circuit Court assumed hypothetically that the cap might be applicable to the

present case and determined that any pro rata reduction of the verdict, based on Dr. Marcus's joint tortfeasor settlement with the Semskers, should be taken into account prior to application of the non-economic damages cap.[16] We reach the opposite conclusion, holding that the cap on non-economic damages must be applied to reduce the award or verdict prior to any reduction based on a joint tortfeasor settlement.

The statute governing the effect of a joint tortfeasor settlement and release is § 3–1404, entitled "Effect of release on injured person's claim." That section provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

§ 3–1404. Thus, as noted by the Circuit Court, the statute defers to the language of the release for the effect of the settlement.

 The release between the Semskers and Dr. Marcus acknowledged Dr. Marcus' position as a joint tortfeasor and called for a "pro rata reduction of any verdict or judgment of any non-settling tortfeasor." The Circuit Court concluded that the word "verdict" in the release meant the verdict prior to theoretical application of the statutory cap, and that the word "judgment" referred to the capped verdict. Characterizing its conclusion as "fairness" in giving the Semskers the "benefit of their bargain" with Dr. Marcus, the Circuit Court

---

16. According to the Circuit Court's calculations, applying the pro rata reduction first, followed by the cap on non-economic damages, would result in a total judgment of $2,172,936 against the Physicians as non-settling tortfeasors. Reversing the order of operations and applying the cap prior to the pro rata reduction would result in a total judgment of $1,766,686 against the Physicians. Thus, the determination of the appropriate order of operation impacts the amount of the judgment against the Physicians by $406,250.

determined that the joint tortfeasor settlement credit would apply to the uncapped "verdict," rather than the capped "judgment." We disagree with the Court's conclusion in this regard and hold that the word "verdict" in the release means inherently the capped verdict.

Section 3–2A–09(b) provides that "an award or verdict under this subtitle for noneconomic damages for a cause of action arising between January 1, 2005, and December 31, 2008, inclusive, *may not exceed* $650,000." § 3–2A–09(b) (emphasis added). The section mandates that a jury's verdict may not exceed the statutory cap. Thus, any verdict rendered by a jury exceeding the amount of the non-economic damages cap inherently is a verdict in the amount of the cap from the moment it is rendered. Under this construction, the reference in the release to a "verdict" cannot mean the uncapped jury's verdict which exceeds the statutorily-mandated cap; § 3–2A–09(b) states explicitly that there can be no such verdict. As such, the "verdict or judgment" in this case are one in the same—the amount of the jury's verdict reduced in conformity with the non-economic damages cap of § 3–2A–09(b). Thus, the appropriate order of operations is to apply first the cap to the jury's verdict for non-economic damages, followed by a credit for the joint tortfeasor settlement.

In addition, the release states that "[a]ll damages arising out of the occurrence *recoverable* by the [Semskers] against anyone other than [Dr. Marcus] will be reduced as provided in [§ 3–1404]." (Emphasis added). Due to the application of the non-economic damages cap, the only non-economic damages *recoverable* by the Semskers from the Physicians are the damages capped by § 3–2A–09(b). This portion of the release further suggests that any pro rata credit for the joint tortfeasor settlement with Dr. Marcus will be applied only after application of the non-economic damages cap.

Had Dr. Marcus not settled with the Semskers, and had the Semskers proceeded to trial against Dr. Marcus and Dr. Albert, the cap on non-economic damages would have been applied to the total verdict, not to each defendant's pro rata

share of the verdict. Application of the pro rata credit for Dr. Marcus' settlement prior to application of the cap on non-economic damages would not yield a consistent outcome. Rather, such an order of operations hypothetically would enable the Semskers to recover total non-economic damages in an amount in excess of the cap, much the same as if the cap applied only to each defendant's pro rata share of non-economic damages, thus negating the purpose of the cap limiting recovery of non-economic damages. In order to preserve the effectiveness of the cap on non-economic damages and ensure that the joint tortfeasor settlement does not affect Dr. Albert's potential liability for non-economic damages, the cap must be applied prior to any pro rata credit for a joint tortfeasor settlement.

The order of operation that we hold applicable today, applying first the cap on non-economic damages followed by any credit for a joint tortfeasor settlement, has been adhered to previously by Maryland courts without exception. *See Franklin v. Morrison,* 350 Md. 144, 153, 174–75, 711 A.2d 177, 182, 192–93; *Anne Arundel Med. Center, Inc. v. Condon,* 102 Md.App. 408, 414, 649 A.2d 1189 (1994).

### V. Evidence of Write–Offs and the Collateral Source Rule

The Circuit Court held that, because the Physicians failed to adduce at trial evidence of certain write-offs of past medical expenses by Mr. Semsker's health care providers, the Physicians could not avail themselves in a post-trial motion of the provisions of § 3–2A–09(d)(1), which provides that "[a] verdict for past medical expenses shall be limited to: (i) [t]he total amount of past medical expenses paid by or on behalf of the plaintiff; and (ii) [t]he total amount of past medical expenses incurred but not paid by or on behalf of the plaintiff for which the plaintiff or another person on behalf of the plaintiff is obligated to pay." § 3–2A–09(d)(1). The Physicians contend that presentation of such evidence during trial would have constituted collateral source evidence contravening the dictates of the common law collateral source rule. That

rule permits an injured person to recover the full amount of his or her provable damages, "regardless of the amount of compensation which the person has received for his [or her] injuries from sources unrelated to the tortfeasor," and generally prohibits presentation to a jury of evidence of the amount of medical expenses that have been or will be paid by health insurance. *Haischer v. CSX Transportation, Inc.*, 381 Md. 119, 132, 848 A.2d 620, 627 (2004) (quoting *Motor Vehicle Admin. v. Seidel Chevrolet, Inc.*, 326 Md. 237, 253, 604 A.2d 473, 481 (1992)). Rather, they maintain, reduction of a jury's verdict to reflect write-offs should be undertaken by the trial judge and occur during the post-verdict remittur phase.

In its determination, the Circuit Court found that § 3-2A-09(d) "clearly grafts a legislative exception to the collateral source rule" because, unlike subsection (c)(1), which states that juries may not be informed of the non-economic damages cap and that verdicts for non-economic damages in excess of the cap shall be reduced by the court post-verdict, subsection (d) contains no such limitations or instructions. We disagree with the trial court's conclusion and hold that evidence of write-offs by health care providers should be considered post-verdict by the court, rather than presented to the jury during trial.

The language of § 3-2A-09(d)(1) makes no mention of the collateral source rule, nor does it provide that evidence concerning the payment or write-off of past medical expenses must be submitted during trial for consideration by the jury. This Court long has recognized the principle of statutory interpretation that the common law will not be deemed as repealed by implication. *Suter v. Stuckey*, 402 Md. 211, 232, 935 A.2d 731, 743 (2007); *Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698, 702 (1999). Thus, if possible, we shall strive to interpret § 3-2A-09(d) to avoid repeal or altering the application of the common law collateral source rule.

Section 3-2A-09(d)(1) states that verdicts for past medical expenses *shall* be limited to the total amount of past medical expenses paid by or on behalf of the plaintiff and the total

amount of past medical expenses incurred, but not yet paid, for which the plaintiff or another person on behalf of the plaintiff is obligated to pay. § 3–2A–09(d)(1). Thus, the section mandates that amounts written-off shall not be included in the verdict. The question, for which the statute provides no express answer, is whether consideration of write-offs falls to the jury during trial or to the judge post-verdict in remittur.

If it is for the jury to consider write-offs and reduce their verdict accordingly, it will be necessary for a defendant to introduce evidence to the jury of the actual payments made by the plaintiff's health insurers or other collateral sources. As noted *supra,* such evidence contravenes the collateral source doctrine. Adopting this interpretation would require reading § 3–2A–09(d), as the Circuit Court did here, as fashioning a legislative exception on the collateral source rule, despite the statute's omission of any reference to that rule. Alternatively, if evidence of write-offs and discounts by the plaintiff's health care providers is to be presented to the court in a post-verdict remittur setting, similar to the procedures found in §§ 3–2A–05(h) and 3–2A–09(c), the collateral source doctrine is not implicated or violated. Under this interpretation, the collateral source rule and § 3–2A–09 may be harmonized such that collateral source evidence of write-offs and discounts is not presented to the jury, but to the court, after the jury has rendered its verdict. Compelled by our duties to harmonize statutory language wherever possible and avoid repeal of the common law by implication, we embrace the latter interpretation as most consistent with the legislative intent and principles of statutory interpretation.

As to the Circuit Court's contention regarding the omission from § 3–2A–09(d) of language similar to that in § 3–2A–09(c)(1) that juries not be informed of the non-economic damages cap, we note that the long-standing acceptance of the collateral source rule and its prohibition on the presentation of collateral source evidence to the jury obviates any need for the General Assembly to confirm its applicability in

§ 3–2A–09(d). Longstanding principles of the common law need no such statutory affirmation to have continuing effect. Thus, we hold that any evidence of write-offs and discounts by Mr. Semsker's health care providers properly is considered post-verdict by the court, rather than at trial to the jury. The Circuit Court erred by finding that the Physicians waived their right to reductions under § 3–2A–09(d) based on their failure to present evidence of the write-offs during the trial.

## VI. Conclusions

To summarize, we hold that: (1) the non-economic damages cap provided for in § 3–2A–09(b) applies to all health care malpractice claims brought under subtitle 3–2A, including the present case for which arbitration had been waived pursuant to § 3–2A–06B; (2) the noneconomic damages cap should be applied to the jury's verdict prior to application of the pro rata credit provided for in Dr. Marcus's joint tortfeasor settlement and release; and, (3) the Physicians did not waive their right to any potential reduction under § 3–2A–09(d) based on write-offs by Mr. Semsker's health care providers due to their failure to adduce at trial evidence of such write-offs. Our holdings rest squarely on the principles of sound statutory interpretation and track the General Assembly's intent for the consideration of health care malpractice claims. We reverse the judgment of the Circuit Court for Montgomery County and remand the case to it with directions that the court apply, in accordance with § 3–2A–09(b), the cap on non-economic damages to the verdict, prior to application of the pro rata credit based on the Semskers' joint tortfeasor settlement with Dr. Marcus, and to conduct a remittur hearing to determine the amount of any write-offs by Semsker's health care providers and reduce the judgment accordingly.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY THE APPELLEES/PETITIONERS, THE SEMSKERS.**