*Julian Andrew Johnson v. State of Maryland*, Nos. 1924, 1926, 1929, and 1930, Sept. Term 2021.
Opinion by Zic, J.

**CRIMINAL PROCEDURE – "JUVENILE RESTORATION ACT"**

Criminal Procedure § 8-110, also known as the Juvenile Restoration Act, or "JUVRA," provides that "an individual who . . . was convicted as an adult for an offense committed when the individual was a minor" and "has been imprisoned for at least 20 years for the offense" may "file a motion with the court to reduce the duration of the sentence." A "sentence" for "the offense" is at least 20 years when the punishment for all counts within one case adds up to at least 20 years' incarceration. Sentences across cases, however, may not be aggregated for purposes of JUVRA eligibility.

Circuit Court for Wicomico County
Case Nos. 22-K-99-000114, 22-K-99-000115,
22-K-99-000116, 22-K-99-000365

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

Consolidated Appeals
Nos. 1924, 1926, 1929, and 1930

September Term, 2021
_____

JULIAN ANDREW JOHNSON

v.

STATE OF MARYLAND

_____

Zic,
Ripken,
Meredith, Timothy E.,
        (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Zic, J.
_____

Filed: May 30, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a
constitutional amendment changing the name of the Court of Special Appeals of
Maryland to the Appellate Court of Maryland. The name change took effect on
December 14, 2022.

In 1998, when he was a minor,[1] Julian Andrew Johnson, appellant, committed a series of crimes on four separate occasions, was charged as an adult and convicted in each case, and was given sentences which, cumulatively, resulted in 50 years' imprisonment. More than 20 years later, in 2021, the Maryland General Assembly enacted the Juvenile Restoration Act ("JUVRA"),[2] which conferred on certain juveniles the opportunity to file "motion[s] with the court to reduce the duration of [their] sentence[s]." *See* 2021 Md. Laws, ch. 61, § 1; Md. Code Ann., Crim. Proc. § 8-110 (2001, 2018 Repl. Vol., 2022 Supp.). Under JUVRA, juveniles who were charged as adults, were convicted, and are serving sentences of at least 20 years may be eligible to file such motions.

In November 2021, Mr. Johnson filed motions in all four of his cases (Case Nos. 114, 115, 116, and 365), seeking to reduce the duration of his sentences under JUVRA. In each case, the circuit court denied his motion on the ground that he was ineligible for relief under the terms of the statute. In these consolidated appeals, Mr. Johnson now challenges those rulings.

---

[1] At the time of the offenses that are the subject of these appeals, between September and December 1998, Mr. Johnson was under the age of 18.

[2] Mr. Johnson refers to the Act as the "JRA." To avoid confusion with a previous Act, the Justice Reinvestment Act, 2016 Md. Laws, ch. 515, commonly known by the same acronym, we adopt throughout this opinion the acronym used in the State's brief, "JUVRA." *See also Farmer v. State*, 481 Md. 203, 230 (2022) (referring to 2021 Md. Laws, ch. 61 as "JUVRA"); *Malvo v. State*, 481 Md. 72, 85 (2022) (same).

## QUESTIONS PRESENTED

Mr. Johnson presents two questions on appeal:[3]

1. Whether the circuit court erred in ruling that Mr. Johnson was ineligible for a sentence modification under the Juvenile Restoration Act because he could not serve 20 years on either of the component 15-year sentences in Case No. 116.

2. Whether the circuit court erred in treating Mr. Johnson's four sentences across four cases as separate and distinct as opposed to considering the overall sentence for purposes of eligibility under the Juvenile Restoration Act.

For the reasons that follow, we reverse and remand, with directions for the circuit court to consider the merits of Mr. Johnson's motion with respect to Case No. 116, but affirm with respect to Case Nos. 115, 114, and 365.

## BACKGROUND

From September to December 1998, Mr. Johnson committed a series of crimes, resulting in four separate sets of charges being filed in the Circuit Court for Wicomico County. We briefly summarize them in chronological order of the crimes. Because the

---

[3] Mr. Johnson phrases the issues as follows:

> 1. In Case No. 22-K-99-000116, the defendant served more than 20 years of a 30-year aggregate sentence that consisted of two consecutive 15-year sentences. Did the court err in ruling that he was ineligible for a sentence reduction under the Juvenile Restoration Act because he had not served 20 years on either of the component 15-year sentences?

> 2. Did the circuit court err in treating the sentences in each of the cases as separate and distinct as opposed to considering the aggregate sentence?

convictions and sentences were imposed in a different chronological order, we summarize the sentencing proceedings in the order in which the sentences were imposed.

***The Crimes***

*Case No. 365[4] (Appeal No. 1929)*

Mr. Johnson ultimately pleaded guilty to second-degree assault in this case. According to the statement of facts entered into the record during the plea proceeding, on September 30, 1998, at approximately 1:00 p.m., Salisbury police officers "were approached by a Chesapeake Utilities employee who informed them that he had just been assaulted."

The victim told police that, 10 or 15 minutes earlier, he had been at Mr. Johnson's nearby residence to cut off gas service. After the victim completed his task, Mr. Johnson's dog "became aggressive and chased after" the victim, and, in self-defense, he maced the dog. Mr. Johnson then "emerged from the back door," shouted at the victim for macing his dog, and "ran back inside the house."

After the victim entered his work truck but before he could drive away, Mr. Johnson "re-emerged, this time holding a black pistol." Mr. Johnson pointed the pistol at the victim. He then used the pistol to break the passenger side window of the victim's vehicle, dropping his weapon into the truck's passenger compartment as he did so, and the victim drove away. Police subsequently recovered the weapon and determined that it was a "Daisy 2003 plastic BB pistol."

---

[4] The full circuit court case number is 22-K-99-000365.

Mr. Johnson was charged in the Circuit Court for Wicomico County with second-degree assault, malicious destruction of property having a value less than $300, and reckless endangerment. On June 4, 1999, Mr. Johnson waived a jury trial and pleaded guilty to second-degree assault. The State entered a nolle prosequi to the remaining charges in this case.[5]

*Case No. 114[6] (Appeal No. 1924)*

Mr. Johnson ultimately pleaded guilty to robbery with a dangerous weapon in this case. According to the statement of facts entered into the record during the plea proceeding, on November 18, 1998, at approximately 9:45 p.m., Salisbury Police responded to a dwelling after receiving a call about a home invasion robbery.

The officers were told that three men carrying shotguns broke into the residence. One of the men discharged his weapon, firing "a shotgun round into the floor near" the feet of a female victim. The five occupants of the dwelling were ordered into the same room, where they were held at gunpoint by one man, while the other two "ransacked" the dwelling. At least $200 in U.S. currency was taken from the victims.

One month later, Mr. Johnson was arrested "in an unrelated case."[7] At that time, he waived his *Miranda*[8] rights and stated to a police officer that he had been involved in

---

[5] In addition, as part of the plea agreement, the State entered a nolle prosequi to all charges in yet another case, No. 22-K-99-000301, which was pending at that time.

[6] The full circuit court case number is 22-K-99-000114.

[7] That "unrelated case" was Case No. 116.

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966) (requiring government to advise accused persons in custody of their Fifth and Sixth Amendment rights).

4

two previous home invasions, including the one that had occurred on November 18 (Case No. 114).

In February 1999, a 20-count criminal information was filed in the Circuit Court for Wicomico County, charging Mr. Johnson with first-degree burglary and multiple counts of armed robbery, assault, and reckless endangerment, as well as related weapons offenses, including possession of a short-barreled shotgun. On June 4, 1999, Mr. Johnson waived a jury trial and pleaded guilty to a single count of armed robbery, and the State entered a nolle prosequi to the remaining charges in this case.

*Case No. 115[9] (Appeal No. 1930)*

This case resulted in a jury trial and a finding of guilt. Evidence adduced at trial showed that, around 7:00 p.m. on December 6, 1998, four masked men, aged approximately 16 to 20 years old and brandishing handguns, kicked in the front door of a home in Salisbury, entered, and robbed its three occupants at gunpoint. Two of those occupants recognized Mr. Johnson as one of the robbers despite the masks they all wore because they recognized his voice and mannerisms.[10] The assailants ransacked the house and took a wallet containing $300 from one victim and prescription drugs belonging to both victims.

---

[9] The full circuit court case number is 22-K-99-000115.

[10] One victim testified that he was previously acquainted with Mr. Johnson because they lived in the same neighborhood, and Mr. Johnson knew the victim's son or nephew. The victim also knew Mr. Johnson's mother and stepfather. He further testified that Mr. Johnson spoke with a recognizable stutter.

In February 1999, a 16-count criminal information was filed in the Circuit Court for Wicomico County, charging Mr. Johnson with first-degree burglary (Count 1), two counts of armed robbery (Counts 2 and 3), conspiracy to commit armed robbery (Count 4), two counts of robbery (Counts 5 and 6), use of a handgun in the commission of a crime of violence (Count 7), use of a handgun in the commission of a felony (Count 8), wearing or carrying a handgun (Count 9), theft of $300 or more (Count 10), two counts of reckless endangerment (Counts 11 and 12), two counts of second-degree assault (Counts 13 and 14), and two counts of first-degree assault (Counts 15 and 16). On June 1, 1999, a jury trial proceeded on those charges, and the jury found Mr. Johnson guilty of 14 of the 16 charges (all except the first-degree assault charges).

*Case No. 116[11] (Appeal No. 1926)*

Mr. Johnson ultimately pleaded guilty to robbery with a dangerous weapon and first-degree assault in this case. According to the statement of facts entered into the record during the plea proceeding, at approximately 10:00 p.m. on December 18, 1998, Wicomico County Sheriff's deputies responded to a call from a location in Salisbury for "an armed robbery with shots fired." Upon responding, they encountered a delivery person, who told the officers that he had been robbed at gunpoint while attempting to deliver a food order to a residence.

According to the victim, when he arrived at the delivery address, he saw Mr. Johnson "sitting on a utility box in front" and determined that Mr. Johnson was the

---

[11] The full circuit court case number is 22-K-99-000116.

person who had placed the food order. According to the victim, Mr. Johnson handed him cash for the order, and when the victim reached for the change, Mr. Johnson produced a .38 caliber revolver, pointed it at the victim's face, and demanded money. The victim "grabbed the handgun and attempted to take it from" Mr. Johnson, but he was unsuccessful. Mr. Johnson renewed his demand for money, and the victim "threw" his money "on the ground" and fled, hiding behind the dumpster of a nearby convenience store, "approximately 60 yards away."

The victim then peered out from his hiding place and saw Mr. Johnson inside the victim's delivery van, which prompted the victim to step out from behind the dumpster and yell at Mr. Johnson. Mr. Johnson "exited the van," "turned to face" the victim, and "fired one shot" at him but missed. The victim ran inside the convenience store, where an employee called 911.

Responding officers "were familiar with" Mr. Johnson and knew that he lived several hundred yards "from the location of the shooting." Because they already "had an open handgun warrant" for Mr. Johnson, they went to his residence and observed him enter a taxicab. Police officers effected a traffic stop and arrested Mr. Johnson. When they did so, they recovered a .38 caliber revolver from the rear floor of the cab, near where Mr. Johnson had been sitting.

The victim was transported to the scene of the arrest, where he made a positive identification of Mr. Johnson "based on his appearance and also based on his clothing." Mr. Johnson was transported to the Wicomico County Sheriff's Office, where he waived

7

his *Miranda* rights and gave police a statement, admitting to the robbery and to firing the shot.[12]

In February 1999, an eight-count criminal information was filed in the Circuit Court for Wicomico County, charging Mr. Johnson with armed robbery (Count 1), robbery (Count 2), use of a handgun in the commission of a crime of violence (Count 3), wearing and carrying a handgun (Count 4), first-degree assault (Count 5), second-degree assault (Count 6), reckless endangerment (Count 7), and theft of less than $300 (Count 8). On May 27, 1999, Mr. Johnson pleaded guilty to armed robbery and first-degree assault, and the State entered a nolle prosequi to the remaining charges in this case.

***Sentencing***

*Case No. 116 (Appeal No. 1926)*

On May 27, 1999, the Circuit Court for Wicomico County sentenced Mr. Johnson in this case to 15 years' imprisonment for armed robbery, with a start date of December 18, 1998, and a consecutive term of 15 years' imprisonment for first-degree assault, for an aggregate sentence of 30 years. The court expressly noted that the assault did not merge into the robbery because the assault was based upon a separate act, committed after the robbery had already been completed.

---

[12] Before Mr. Johnson was taken to the Sheriff's Office, he summoned Salisbury Police Lieutenant Elmer Davis and told him "that he wanted to talk to" him privately. Lieutenant Davis elicited a *Miranda* waiver and spoke with Mr. Johnson while he was being transported to the Sheriff's Office. Mr. Johnson told Lieutenant Davis that he had participated in the November 18 (Case No. 114) and December 6 (Case No. 115) home invasion robberies.

*Case No. 115 (Appeal No. 1930)*

In this case, the sentence was imposed the same day the jury rendered its verdict in June 1999. The court was aware that Mr. Johnson had been sentenced the previous week in Case No. 116, and defense counsel asked the court to consider imposing a concurrent sentence. In considering and rejecting that request, the court stated to Mr. Johnson:

> I understand that you received a substantial sentence in a prior case. *And I understand the suggestion that there should be concurrent sentences here. But this is a totally separate incident from the prior case. And concurrent sentences would actually, I guess, send a message that second or third offenses are free in a sense.* And it doesn't seem to me that the behavior in this particular case that you have been convicted of, that that's a message that we want to send to the community and certainly not a message we want sent to you.

> So as a result, considering the facts of this particular case, your prior record, and particularly the conviction and the sentencing in the case last week, enter the following sentences with respect to these charges.

(Emphasis added.)

The court then pronounced the following terms of incarceration on the various counts in this case:

- Count 1 (first-degree burglary): 15 years' imprisonment, consecutive to the sentence in No. 116;

- Count 2 (armed robbery): 15 years' imprisonment, consecutive to the sentence in No. 116, but concurrent with Count 1 in this case;

- Count 3 (armed robbery): 15 years' imprisonment, consecutive to the sentence in No. 116, but concurrent with Count 1 in this case;

- Count 4 (conspiracy to commit armed robbery): 15 years' imprisonment, consecutive to the sentence in No. 116, but concurrent with Count 1 in this case;

9

- Count 8 (use of a handgun in the commission of a felony): 5 years' imprisonment, consecutive to the sentence in No. 116, and consecutive to the sentence in Count 1 in this case;

- Count 10 (theft greater than $300): 8 years' imprisonment, consecutive to the sentence in No. 116, but concurrent with Count 1 in this case;

- Count 11 (reckless endangerment): 5 years' imprisonment, consecutive to the sentence in No. 116, but concurrent with Count 1 in this case; and

- Count 12 (reckless endangerment): 5 years' imprisonment, consecutive to the sentence in No. 116, but concurrent with Count 1 in this case.

The court merged the remaining counts for sentencing purposes. As a result, the total term of incarceration in Case No. 115 was 20 years, consecutive to the 30 years in Case No. 116, for a total term of 50 years.

*Case Nos. 114 and 365 (Appeal Nos. 1924 and 1929)*

On June 4, 1999, following the guilty pleas in Case Nos. 114 and 365, the court sentenced Mr. Johnson to 10 years' imprisonment for armed robbery in Case No. 114 and to 5 years' imprisonment for second-degree assault in Case No. 365. Both sentences were imposed consecutively to the 30-year sentence in Case No. 116 but concurrently with the 20-year sentence in Case No. 115. The net effect was that Mr. Johnson's overall sentence remained 50 years' imprisonment.

**Denial of Motions for Modification of Sentence**

On November 21, 2021, in the Circuit Court for Wicomico County, Mr. Johnson filed a Motion for Modification of Sentence pursuant to JUVRA in all four cases and

requested a hearing in each motion.[13]  In his motions, Mr. Johnson averred that he had been "convicted as an adult for an offense committed when he was a 16[-]year[-]old minor," that he had been sentenced before October 1, 2021, that he had been "imprisoned for 23 years,"[14] that he "is not a danger to the public," that "the interests of justice will be better served by a reduced sentence," and that he "has demonstrated maturity, rehabilitation, and fitness to reenter society."

On January 28, 2022, the circuit court denied all four of Mr. Johnson's motions without a hearing.  In Case No. 114, the court's order stated:

> Denied.  Defendant does not qualify for relief under section 8-110 of the Criminal Procedure Article of the Annotated Code of Maryland because he has not been incarcerated for at least 20 years for an offense in this case.  His sentence in this case was for 10 years.

In Case No. 115, the court's order stated:

> Denied.  Defendant is not entitled to relief under section 8-110 of the Criminal Procedure Article of the Annotated Code of Maryland because he has not been imprisoned for at least 20 years for an offense.  Defendant did not receive a sentence of 20 years or more for any offense in this case.

In Case No. 116, the court's order was nearly identical to the one in Case No. 115, stating:

> Denied.  Defendant is not entitled to relief under section 8-110 of the Criminal Procedure Article of the Annotated Code of Maryland because he has not been imprisoned for at

---

[13] Mr. Johnson filed those motions pro se, but he is represented by the Office of the Public Defender in this appeal.

[14] With the start date of his incarceration being December 18, 1998, Mr. Johnson has now been incarcerated for over 24 years.

11

least 20 years for an offense. Defendant did not receive a sentence for 20 years or more for any offense in this case.

Finally, in Case No. 365, the court's order stated:

Denied. Defendant does not qualify for relief under section 8-110 of the Criminal Procedure Article of the Annotated Code of Maryland because he has not been imprisoned for 20 years for an offense in this case. Defendant received a sentence of 5 years in this case.

Mr. Johnson noted timely appeals in all four cases. We subsequently granted Mr. Johnson's unopposed motion to consolidate these appeals.

## DISCUSSION

I. **APPEALABILITY**

Although neither party raises this issue, we must preliminarily determine whether we have appellate jurisdiction in these cases. *See*, *e.g.*, *Johnson v. Johnson*, 423 Md. 602, 605-06 (2011) (observing that "an order of a circuit court must be appealable in order to confer jurisdiction upon an appellate court, and this jurisdictional issue, if noticed by an appellate court, will be addressed *sua sponte*"); *Stachowski v. State*, 416 Md. 276, 285 (2010) (observing that, "[a]lthough none of the parties raised a jurisdictional issue in these cases," the Supreme Court of Maryland[15] "is obligated to address *sua sponte* the issue of whether [it] can exercise jurisdiction").

---

[15] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See also* Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland . . . .").

In general, a final order of a circuit court is appealable under the Courts and Judicial Proceedings Article, § 12-301, which codifies the final judgment rule:

> Except as provided in § 12-302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

On the other hand, the Supreme Court has held that a "discretionary denial" of a motion for modification of sentence, under Maryland Rule 4-345(e), which bears at least a superficial similarity to a motion for modification of sentence under Criminal Procedure § 8-110, generally is not appealable. *Hoile v. State*, 404 Md. 591, 617 (2008).

In *Hoile*, the Court distinguished "motions to correct a sentence based upon an error of law and motions to reconsider sentence that are entirely committed to a court's discretion." *Id.* The Court concluded that only an appeal from the denial of a motion "entirely" within a sentencing court's discretion is barred. *Id.*

Here, the circuit court did not exercise discretion. Rather, it ruled in each case that Mr. Johnson was ineligible to seek relief under Criminal Procedure § 8-110. Those rulings were legal determinations that were "unqualified" and conclusively settled Mr. Johnson's rights in the subject matter and were, therefore, final judgments. *See Hill v.*

13

*State*, 247 Md. App. 377, 387 (2020) (citation and quotation omitted).  Accordingly, we conclude that the circuit court's orders in these cases are appealable final judgments.[16]

## II.    THIS COURT REVERSES AND REMANDS WITH RESPECT TO CASE NO. 116 AND AFFIRMS WITH RESPECT TO CASE NOS. 115, 114, AND 365.

These appeals turn on whether Mr. Johnson satisfies the eligibility criteria to seek relief under Criminal Procedure § 8-110, also known as the Juvenile Restoration Act ("JUVRA").  "The interpretation of a statute is a question of law that [an appellate court] reviews *de novo*."  *Johnson v. State*, 467 Md. 362, 371 (2020) (citation omitted).

"We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly."  *Id.* (citation and quotation marks omitted).  When interpreting a statute, therefore, we begin "with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology."  *Id.* (citation and quotation marks omitted).  Throughout our reading of the statute, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate legislative intent."  *Testerman v. State*, 170 Md. App. 324, 338 (2006) (citations and quotation marks omitted) (cleaned up); *Creighton v. Montgomery County*, 254 Md. App. 248, 257 (2022) (citations and quotation marks omitted) (stating

---

[16] In these cases, the court did not conduct a hearing addressing the merits of the motions.  We need not, therefore, address whether a circuit court's denial of a motion for modification of sentence, following a hearing that addresses the merits of that motion, is appealable.

that the primary aim of statutory interpretation is to "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied").

"We read the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, [or] meaningless . . . ." *Johnson*, 467 Md. at 372 (citation and quotation marks omitted). "We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010) (citation omitted). The plain language "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276 (citation omitted). Our search for legislative intent contemplates "the consequences resulting from one construction rather than another." *Blaine v. Blaine*, 336 Md. 49, 69 (1994) (citation omitted).

Additionally, "[w]e presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Lockshin*, 412 Md. at 276 (citation omitted). When the "words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia." *Id.* (citations omitted).

We further note that JUVRA is a remedial statute and "must be construed liberally." *See Washington v. State*, 450 Md. 319, 334 (2016). That does not, however,

"grant us license to redraft the statute beyond its clear meaning and the legislature's intent." *Id.* at 334-35 (citation and quotation omitted). We, therefore, "do not add provisions or tailor existing ones to change the mandatory nature of the statute's language in order to favor" Mr. Johnson. *Id.* at 335 (citation and quotations omitted).

When reading the plain language of the statute, we must determine whether it is ambiguous in the context of the statutory purpose. *See Lockshin*, 412 Md. at 276. Broadly, the purpose of JUVRA is to provide a mechanism by which a juvenile offender convicted as an adult may seek a modification of sentence after serving 20 years' incarceration. The statute was introduced and supported under the theory that juveniles have diminished culpability at the time of their crime(s) and are likely to have been rehabilitated during their incarceration, and, thus, the public interest may be best served by their release.[17] JUVRA applies to "an individual who . . . has been imprisoned for at

---

[17] When Senator West, one of the sponsors of the bill, introduced the bill to the Judicial Proceedings Committee, he emphasized, "Any human being who reaches his 37th birthday is a different person than he was at the age of 17." Hearing in the Judicial Proceedings Committee at 2:11:00-2:13:00 (Feb. 17, 2021), available at https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jpr&ys=2021R S&clip=JPR_2_17_2021_meeting_2&url=https%3A%2F%2Fmgahouse.maryland.gov% 2Fmga%2Fplay%2Fce03edc3-b677-4ecd-be9d-31dd3dcaeae4%3Fcatalog%2F03e481c7-8a42-4438-a7da-93ff74bdaa4c%26playfrom%3D7652277 (last visited April 21, 2023). He went on to say, "A person's brain doesn't fully mature until he's 25 years old, and with maturity comes different thinking, different attitudes, and a different approach to life." *Id. See also* S.B. 494 Written Testimony, Judicial Proceedings 02/17/2021, available at https://mgaleg.maryland.gov/mgawebsite/Legislation/WitnessSignup/SB0494?ys=202 1RS (last visited March 28, 2023) (containing written testimony in support of and opposing this bill).

(continued)

least 20 years for the offense." As the questions raised in these appeals suggest, though, the plain language of the statute regarding JUVRA eligibility is ambiguous in light of the larger statutory context and the purpose of the statute. We, therefore, search "for legislative intent in other indicia" beyond the text. *Lockshin*, 412 Md. at 276.

These appeals present the question of how we determine whether an individual "has been imprisoned for at least 20 years for the offense" for purposes of JUVRA. The answer depends primarily on how we define "sentence" and "offense." We begin with the relevant text of the statute:

> (a) This section applies only to an individual who:
>
> > (1) was convicted as an adult for *an offense* committed when the individual was a minor;
> >
> > (2) was sentenced for *the offense* before October 1, 2021; and
> >
> > (3) *has been imprisoned for at least 20 years for the offense.*
>
> (b) (1) An individual described in subsection (a) of this section may file a motion with the court to reduce the duration of *the sentence*.

---

The line of cases from the United States Supreme Court interpreting the Eighth Amendment with respect to juvenile sentencing supports this theory that juveniles have diminished culpability at the time of their criminal conduct and are more capable of rehabilitation. *See Roper v. Simmons*, 543 U.S. 551 (2005) (holding that Eighth Amendment prohibits death penalty for juvenile offenders); *Graham v. Florida*, 560 U.S. 48 (2010) (holding that Eighth Amendment prohibits sentence of life without parole for nonhomicide juvenile offenders and requires nonhomicide juvenile offenders have a meaningful opportunity to obtain release); *Miller v. Alabama*, 567 U.S. 460 (2012) (holding that Eighth Amendment prohibits mandatory life without parole for juvenile offenders).

(2)  A court shall conduct a hearing on a motion to reduce the duration of *a sentence*.

* * *

(c)  Notwithstanding any other provision of law, after a hearing under subsection (b) of this section, *the court may reduce the duration of a sentence imposed on an individual for an offense committed when the individual was a minor* if the court determines that:

(1)  the individual is not a danger to the public; and

(2)  the interests of justice will be better served by a reduced sentence.

Crim. Proc. § 8-110 (emphasis added).

JUVRA, enacted in 2021, does not define the terms "offense" and "sentence." 2021 Md. Laws, ch. 61.  We turn, therefore, to "the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *Lockshin*, 412 Md. at 276 (citations omitted).  That context is Title 8, Subtitle 1 of the Criminal Procedure Article.

Criminal Procedure §§ 8-102 to 8-109 was originally enacted as the Review of Criminal Sentences Act[18] and applies to the review of a defendant's sentence by a three-judge panel.  2001 Md. Laws, ch. 10.  This section of the Code was recodified to its

---

[18] Rule 4-344(a), which applies to § 8-102, identifies the Review of Criminal Sentences Act as being found in §§ 8-102 to 8-109 of the Criminal Procedure Article. When defining "total period of sentence," § 8-102(c) begins, "For purposes of this subtitle, . . . ."  Although JUVRA is now contained in the same subtitle, § 8-102 was enacted as part of the Review of Criminal Sentences Act, so this language originally referred only to the sections contained by that act.

18

current form prior to JUVRA's enactment.[19]  Twenty years later, the General Assembly placed JUVRA in that same subtitle, but it does not form part of the Review of Criminal Sentences Act.  *See* Md. R. 4-344(a) (identifying the Review of Sentences Act as being found in §§ 8-102 to 8-109).  The floor report from the Senate Judicial Proceedings Committee and the floor report from the entire Senate include separate discussions of JUVRA and "current law," such as the Review of Criminal Sentences Act and other mechanisms for sentence review.  S.B. 494 (2021) – Judicial Proceedings Committee: Juvenile Restoration Act (referring to the Review of Criminal Sentences Act as being found in §§ 8-102 to 8-109); S.B. 494 (2021):  Juvenile Restoration Act (same).  Because these floor reports were heard by the entire Committee and Senate, respectively, they constitute evidence of the Senate's awareness of the existing law.[20]  The Senate was aware of this law and included JUVRA in the same subtitle but made no indication that JUVRA would supplement or integrate with the Review of Sentences Act.

---

[19] The Review of Criminal Sentences Act was enacted originally as part of the statutory predecessor to the Courts Article (Article 26, §§ 132-138).  1966 Md. Laws, ch. 288.  Seven years later, when the Courts and Judicial Proceedings Article was first created, the Review of Criminal Sentences Act was transferred to Article 27, and the sections were renumbered as §§ 645JA through 645JG.  1973 Md. Laws, 1st Sp. Sess., ch. 2.

[20] Floor reports are an excellent source of legislative history for this reason, and this Court frequently relies on them.  *Daughtry v. Nadel*, 248 Md. App. 594, 621 n.19 (2020) ("In analyzing a statute, Floor Reports often serve as key legislative documents.") (citations and quotation marks omitted); *see* Jack Schwartz and Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: the Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 442 (1995) (identifying floor reports as important sources of legislative history).

Also, although § 8-102 contains provisions for calculating a "total period of sentence" for purposes of a sentence review by a review panel, § 8-110 has an entirely different purpose and function than § 8-102. Section 8-102 provides the defendant with an opportunity for sentence review by a three-judge panel immediately after sentencing. A motion for review under this section must be filed within 30 days of sentencing and must be disposed of no later than 30 days after the motion is filed. Md. R. 4-344(a) (applying 30-day filing deadline to Criminal Procedure §§ 8-102 to 8-109); Crim. Proc. §§ 8-101(b), 8-102(a), 8-107(b). At the time of the sentence review, therefore, the defendant likely has no new information to present to the review panel, being that no more than 60 days have passed since sentencing.

JUVRA provides for a different kind of review; defendants may file a motion pursuant to JUVRA after they have served at least 20 years of imprisonment, and the defendants have additional information, such as proof of maturation and rehabilitation, to present to the reviewing court. Crim. Proc. § 8-110(a), (d). Maryland Rule 4-345 provides for a similar kind of review as JUVRA, allowing defendants to file a motion to modify within 90 days of sentencing, which may be held sub curia for up to five years. Md. R. 4-345(e). Defendants seeking this kind of sentence review, therefore, may also have additional information to present to the reviewing court by virtue of passage of time. JUVRA is more like Rule 4-345 than Rule 4-344 or Criminal Procedure § 8-102.

For these reasons, we discern no indicia of legislative intent for § 8-102 to apply to JUVRA. It is also unclear how such application would function if we were to use the definition of "total period of sentence" from § 8-102(c) when interpreting JUVRA

20

because of the significant difference in function and timing between § 8-102 and JUVRA. We, therefore, decline to apply § 8-102(c) to calculate the "total period of sentence" with respect to either of the issues before this Court in the present appeal.[21]

### A. The Circuit Court Erred in Ruling Mr. Johnson Was Ineligible for a Sentence Modification under JUVRA for his Case No. 116.

In Case No. 116 (Appeal No. 1926), Mr. Johnson contends that the circuit court erred in construing the statutory terms "offense" and "sentence" in JUVRA "as narrowly as possible," seeming to interpret "offense" to mean "a specific violation of a law that would be charged in a single count" in a charging document, and "sentence" to mean "the punishment imposed on a single count." Thus, the circuit court, applying its narrow construction of the statute, determined that Mr. Johnson was ineligible for a sentence modification in Case No. 116 because he was serving two consecutive 15-year sentences and could therefore never be "imprisoned for at least 20 years for the offense," as required under Criminal Procedure § 8-110(a)(3).

Mr. Johnson contends that the terms "offense" and "sentence" are ambiguous. Accordingly, he urges that, "at a minimum," we construe "offense" as referring to "conduct during an incident or transaction, even if that conduct violates multiple laws and generates multiple counts," and correspondingly interpret "sentence" as the "aggregate sentence imposed for all the counts in a case." Thus, under Mr. Johnson's interpretation of the statute, the circuit court should have regarded his sentence in Case No. 116 as a

---

[21] The General Assembly may choose to amend JUVRA to clarify whether and how the remainder of Title 8, Subtitle 1 should apply to § 8-110.

30-year sentence rather than two 15-year sentences, thereby rendering him eligible for relief under JUVRA.

The State agrees with Mr. Johnson, that the circuit court erred in interpreting "offense" and "sentence" as narrowly as possible. The State contends that "'offense' should be interpreted to mean conduct occurring during a criminal transaction even if that conduct results in multiple criminal charges," and "'sentence' should be interpreted to mean the aggregate sentence imposed for all counts in a case." Those interpretations of the statutory terms "offense" and "sentence," the State contends, are necessary to avoid "absurd results" (specifically, to avoid a situation where eligibility for relief depends upon the vagaries of how a court structured a defendant's sentence) and to best effectuate the legislative intent of JUVRA.

As noted above, we view the plain language "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Lockshin*, 412 Md. at 276. In this regard, the primary aim of statutory interpretation is always to "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied." *Creighton*, 254 Md. App. at 257 (citations and quotation marks omitted). We begin with the plain language and an ordinary understanding of the text. *Johnson*, 467 Md. at 371.

22

Here, neither JUVRA nor § 8-101, "Definitions," specifically defines "offense" or "sentence."[22] The remainder of the statutory context, as explained above, does not clarify the meaning of these words. Dictionary definitions of the terms also do not shed much light on the matter.[23] Furthermore, § 8-110 does not provide guidance for calculating a sentence for purposes of eligibility under the statute.

Additionally, when interpreting statutes, we "avoid constructions that would lead to absurd results." *Testerman*, 170 Md. App. at 338 (citation and quotation marks omitted). Mr. Johnson and the State explain in their briefs the "absurd results" that would proceed from reading JUVRA narrowly, meaning "offense" would refer to one count on a charging or verdict sheet and "sentence" would refer to the punishment attached to a single count on a verdict sheet. For example, a minor who is convicted of multiple less serious crimes in a single incident (e.g., multiple counts of fourth-degree burglary) could be ineligible for relief even if the aggregate sentence in that case totals to

---

[22] Section 8-101 defines the terms "review panel," "sentencing court," and "sentencing judge."

[23] One well-known source defines "offense" as a "violation of the law; a crime, often a minor one." *Black's Law Dictionary* 1300 (11th ed. 2019). Given that a defendant must have served a term of at least 20 years' imprisonment to be eligible for reconsideration of his sentence under the statute at issue, we think it fair to say that an "offense" in this context is not "minor." Other sources define "offense (or offence)" as "an infraction of law: CRIME," *The Merriam-Webster Dictionary* 501 (2016), or "a breach of law or rule; an illegal act." *The Oxford Dictionary of English* 1231 (3d ed. 2010).

Definitions for "sentence" are similarly unilluminating for purposes of JUVRA. One definition provides that a "sentence" is "[t]he judgment that a court formally pronounces after finding a criminal defendant guilty; the punishment imposed on a criminal wrongdoer." *Black's Law Dictionary* 1636 (11th ed. 2019).

23

more than 20 years, while a minor who is convicted of one very serious crime (e.g., one count of first-degree murder) would be eligible because the minor received more than 20 years' incarceration on a single count.

Another absurd result of such a reading would be that, between two defendants convicted of, for example, two counts of second-degree murder, one may be eligible under JUVRA and the other ineligible, depending on the sentencing structure in each of the cases. If Defendant 1 is sentenced to two consecutive terms of 15 years, and Defendant 2 is sentenced to two concurrent terms of 30 years, Defendant 2 would be eligible under JUVRA while Defendant 1 would not, even though the effect of both sentences is 30 years' incarceration.

Because reading the statute narrowly could produce absurd results, we adopt the parties' interpretation and read "sentence" to refer to the aggregated punishments imposed for all counts within one case. A "sentence" for "the offense," then, is at least 20 years when the punishment for all counts within one case adds up to at least 20 years' incarceration.[24] A defendant is eligible to file a motion for sentence modification under JUVRA, therefore, when (1) within one case, his or her "sentence" as defined here is at least 20 years' incarceration, and (2) he or she has served at least 20 years of that "sentence." Crim. Proc. § 8-110.

---

[24] An additional complication could arise where the sentence currently being served resulted from the imposition of some or all of a previously suspended sentence. That question is not before us, and we need not address it.

In Case No. 116 (Appeal No. 1926), Mr. Johnson pleaded guilty to one count of armed robbery and one count of first-degree assault. He received 15 years' incarceration for the armed robbery conviction and 15 years' incarceration for the first-degree assault conviction. When we add the punishment for these counts together, the sentence in this case for purposes of JUVRA is 30 years' incarceration.[25] Furthermore, Mr. Johnson has been imprisoned for approximately 24 years, so he "has been imprisoned for at least 20 years for the offense."[26] Crim. Proc. § 8-110(a)(3). Therefore, the circuit court erred in denying his motion for modification of sentence for Case No. 116 on grounds of ineligibility. Moreover, pursuant to § 8-110(b)(2), the circuit court was required to hold a hearing on the merits of Mr. Johnson's motion and shall do so upon this Court's remand of the case.

### B. The Circuit Court Did Not Err in Denying Mr. Johnson's Motions for Case Nos. 115, 114, and 365.

In the other three appeals (Case No. 115/Appeal No. 1930, Case No. 114/Appeal No. 1924, and Case No. 365/Appeal No. 1929), Mr. Johnson contends that this Court should adopt the broadest possible reading of the statutory terms "offense" and "sentence." If the sentences in Case Nos. 115, 114, and 365 are each treated as "separate and distinct" from each other and Case No. 116 for the purpose of JUVRA eligibility, as

---

[25] We emphasize that our interpretation of "sentence" is in the limited context of Criminal Procedure § 8-110. In other contexts, Mr. Johnson's sentence for first-degree assault was for a term of 15 years, and nothing we say here should be construed as affecting in any way the legality of the sentence, which cannot have exceeded (and did not exceed) 25 years. Md. Code Ann. (2002, 2021 Repl. Vol.), Crim. Law § 3-202(c).

[26] Because Mr. Johnson was sentenced in Case No. 116 first, before the other three cases, he has been serving time only for Case No. 116 thus far—24 of 30 years.

the circuit court treated them, then Mr. Johnson "would not be eligible for a reduction of any of those [three] sentences." According to Mr. Johnson, the circuit court's "narrow reading . . . fails to effectuate the purpose of the Juvenile Restoration Act." Instead, Mr. Johnson urges that we construe JUVRA broadly, to permit aggregation of all the terms of imprisonment that were imposed on him for criminal conduct in which he engaged as a minor, including aggregation of sentences across multiple cases. Mr. Johnson asserts that "[t]here are reasons to believe the General Assembly anticipated and intended this result."

One reason, Mr. Johnson contends, to think that the General Assembly intended a broad interpretation is that the Supreme Court of Maryland has observed that there "may be" circumstances where it is appropriate to consider multiple consecutive sentences as a single sentence for purposes of the Eighth Amendment.[27] *Carter v. State*, 461 Md. 295, 356-57 (2018). Another reason Mr. Johnson suggests is that "the General Assembly has approached sentences in this manner in the same subtitle in which [Criminal Procedure] § 8-110 appears." In support, Mr. Johnson points out that Criminal Procedure § 8-102 permits aggregation of sentences imposed in separate cases.[28]

---

[27] In response to this argument, we note that no one argues that JUVRA implicates the Eighth Amendment or remedies an Eighth Amendment violation. We also see no comparison to Eighth Amendment jurisprudence in the legislative history for JUVRA. We cannot assume, therefore, that the General Assembly intended to adopt this meaning in the different context of JUVRA. *See Washington*, 450 Md. at 335.

[28] As discussed above, we decline to apply the language from § 8-102 directly to our interpretation of JUVRA, but the approach found in § 8-102 may still be instructive to our interpretation.

The State disagrees with Mr. Johnson's interpretation of JUVRA on this issue for several reasons. First, according to the State, "the legislative history of [JUVRA] suggests that the General Assembly did not intend [Mr.] Johnson's interpretation." The State maintains that, because the First Reader of 2021 S.B. 494 conditioned eligibility on a defendant having "been imprisoned for at least 20 years," whereas the statute as ultimately enacted modified that condition to having "been imprisoned for at least 20 years *for the offense*," the statute should be interpreted as not permitting aggregation of sentences imposed for separate criminal transactions. Crim. Proc. § 8-110(a)(3) (emphasis added). Second, according to the State, in *Malvo v. State*, the Supreme Court of Maryland declined to adopt Mr. Johnson's interpretation of JUVRA, even though doing so would have permitted it to avoid deciding a constitutional question. 481 Md. 72 (2022).[29] And, finally, according to the State, Mr. Johnson's suggested interpretation

---

[29] In response to the State's citation to *Malvo*, we note that *Malvo* was one of a series of decisions interpreting the Eighth Amendment in the context of juvenile life-without-parole sentences, and our Supreme Court was applying the interpretation of that constitutional provision by the United States Supreme Court to the context of Maryland sentencing law. This weighs against placing too much weight on the doctrine of constitutional avoidance.

Also, the remark in *Malvo* on which the State relies, refers, in turn, to *Farmer v. State*, 481 Md. 203 (2022). *Malvo*, 481 Md. at 101 n.25 (citing *Farmer*, 481 Md. at 230-31). When we look to *Farmer*, we discover that our Supreme Court avoided the question because, in the context of *Farmer* (and *Malvo*), it appeared that the parties had taken the opposite positions from what would be expected—the State was arguing for a more liberal interpretation of JUVRA eligibility, and the defense was arguing for a more restrictive interpretation, but only for purposes of that case. *Farmer*, 481 Md. at 231-32. It appears that our Supreme Court was more concerned with avoiding interpreting JUVRA because it was unnecessary to decide the case before it, which, again, weighs against placing too much weight on the doctrine of constitutional avoidance. *Id.*

would produce unworkable results. For example, the State notes that if a defendant, otherwise similarly situated to Mr. Johnson, had been convicted in more than one county, it is unclear where a motion for modification of sentence may be filed.

Again, we begin by reading the statutory language in the context of the legislative purpose. *Lockshin*, 412 Md. at 275. Because the legislative intent is unclear for various reasons, we decline to read the statutory language as broadly as Mr. Johnson requests. *See State v. Bey*, 452 Md. 255, 265 (2017) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with 'forced or subtle interpretations' that limit or extend its application.").

First, throughout the statute, the terms "offense" and "sentence" appear only in the singular, but, as discussed above, to read those terms narrowly could produce absurd results and be contrary to the purpose of the statute. On the other hand, the General Assembly chose not to use the plural form, and, therefore, we cannot assume, without some other indicia of intent, that they intended a plural meaning. *Bey*, 452 Md. at 265-66. These terms are used in the singular throughout the floor report from the Senate Judicial Proceedings Committee and the floor report from the entire Senate. S.B. 494 (2021) – Judicial Proceedings Committee: Juvenile Restoration Act; S.B. 494 (2021): Juvenile Restoration Act.

Additionally, before JUVRA was enacted, this legislation was amended various times, but these amendments do little to illuminate the General Assembly's intent regarding JUVRA eligibility. In its brief for this case, the State refers to an amendment

28

to the bill that clarifies the language by adding "for the offense" to § 8-110(a). When the amendment was adopted in the House, however, Delegate Luke Clippinger, the Chair of the House Judiciary Committee and floor leader for this bill, briefly explained the effect of various other amendments but did not mention the addition of the words "for the offense."[30] We cannot, therefore, conclude that the addition of these words was intended to be substantive.

Although documents submitted by lobbyists and interested parties do not ordinarily provide insight into the General Assembly's intent, we briefly note that, here, written testimony submitted in support of and opposition to the bill and the legislative hearings related to the bill inconsistently discussed "offense" and "sentence" in the singular and plural. Most often, proponents of the bill referred to the need to provide juvenile offenders with an opportunity for release after 20 years' incarceration, without reference to whether those 20 years were served in one or multiple cases. For example, in written testimony submitted by Doyle Niemann, Chair of the Legislative Committee for the Criminal Law and Practice Section with the Maryland State Bar Association,

---

[30] House Floor Actions, "House Agenda for Proceedings No. 32A," at 13:14 (03/29/2021), available at https://mgaleg.maryland.gov/mgawebsite/FloorActions/Media/house-32-A?year=2021RS (last visited April 20, 2023).

Rejected amendments to bills are weak evidence of the General Assembly's intent, *see Bellard v. State*, 452 Md. 467, 501 (2017), but we note one rejected amendment would have added language to prevent the bill from applying to those convicted of a crime of violence. S.B. 494 (2021), proposed amendment 633129/1 (Senator Hough). Another rejected amendment would have added language to prevent the bill from applying to anyone who committed more than one murder. S.B. 494 (2021), proposed amendment 333020/1 (Senator Gallion).

29

states, "[The bill] provides a mechanism whereby a juvenile convicted of an adult crime can seek reconsideration of his or her sentence after serving 20 years."

This information from JUVRA's legislative history does not provide us with clear indicia of the General Assembly's intent for JUVRA's use of the word "sentence" to refer to the aggregate punishment imposed on juveniles for all crimes committed while they were minors, including aggregation of sentences across cases.[31]  We, therefore, decline to read the statute as broadly as Mr. Johnson requests and instead conclude that Mr. Johnson's Case Nos. 115, 114, and 365 are not eligible for JUVRA review.

Furthermore, throughout JUVRA's life as a bill, neither interested parties nor legislators engaged in, or at least memorialized, discussions of other states' similar statutes, but North Dakota, Washington, and Oregon all enacted statutes prior to JUVRA that provide juvenile offenders with a mechanism for sentence review after a period of years.  We, therefore, make note of those statutes here.

North Dakota enacted its statute on August 1, 2017:

> (1) Notwithstanding any other provision of law, a court may reduce a term of imprisonment imposed upon a defendant convicted as an adult for *an offense* committed and completed before the defendant was eighteen years of age if:
>
>> (a) The defendant has served at least twenty years in custody for *the offense*;
>>
>> (b) The defendant filed a motion for reduction in *sentence*; and

---

[31] As the State notes, to read this statute broadly on this issue could allow the aggregation of sentences in different cases that were imposed in different jurisdictions.

> (c) The court has considered the factors provided in this section and determined the defendant is not a danger to the safety of any other individual, and the interests of justice warrant a sentence modification.

N.D. Cent. Code § 12.1-32-13.1 (emphasis added). North Dakota's statute, like JUVRA, uses the singular form of "offense" and "sentence." In *Carter v. State*, the Supreme Court of Maryland cited this statute, among other states' statutes, and stated, "Some reforms provide all juveniles who have not committed homicide with parole eligibility after a certain number of years, *regardless of how many offenses they have committed*." 461 Md. at 355 n.43 (emphasis added) (citing N.D. Cent. Code § 12.1-32-13.1) (explaining that sentence review is available in North Dakota after "20 years regardless of how sentence is described"). No North Dakota court to date has provided guidance, however, on how to read § 12.1-32-13.1 with respect to the definition of "sentence."

Washington enacted its statute on April 29, 2015, but, unlike Maryland and North Dakota, specifically denotes "one or more crimes":

> (1) Notwithstanding any other provision of this chapter, any person convicted of *one or more crimes committed prior to the person's eighteenth birthday* may petition the indeterminate sentence review board for early release after serving no less than twenty years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's eighteenth birthday, the person has not committed a disqualifying serious infraction as defined by the department in the twelve months prior to filing the petition for early release, and the current sentence was not imposed under [Washington Revised Code §] 10.95.030 or [§] 9.94A.507.

Wash. Rev. Code § 9.94A.730 (emphasis added).

31

Oregon enacted its statute on September 29, 2019, and uses both the singular and plural form for "offense":

> A person convicted of *an offense or offenses* committed when the person was under 18 years of age, who is serving a sentence of imprisonment for the offense or offenses, is eligible for release on parole or post-prison supervision as provided in this section after the person has served 15 years of imprisonment.

Or. Rev. State § 144.397 (emphasis added). If the Maryland General Assembly chooses to revisit JUVRA, it might consider the approach of these three states for guidance on whether "offense" and "sentence" should be singular or plural to effectuate the General Assembly's intent.

Without aggregating the sentences across Mr. Johnson's four cases, Mr. Johnson has only been serving time on the 30-year sentence for Case No. 116; therefore, he could not have served "at least 20 years" on any of the other three cases even if they were otherwise eligible for JUVRA review. In Case No. 115, Mr. Johnson was sentenced to 20 years' incarceration consecutive to the 30-year sentence in Case No. 116; he has not yet begun to serve this sentence. Also, Mr. Johnson was sentenced to 10 years' incarceration in Case No. 114 and five years' incarceration in Case No. 365; therefore, without legislative action, neither of those sentences will be eligible for JUVRA review because he cannot serve "at least 20 years" for a sentence of less than 20 years.

Accordingly, we shall reverse and remand with directions for the circuit court to consider the merits of Mr. Johnson's motion with respect to Case No. 116, but affirm with respect to Case Nos. 115, 114, and 365.

**FOR CASE NO. 116, JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. FOR CASE NOS. 115, 114, AND 365, JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID 50% BY WICOMICO COUNTY AND 50% BY APPELLANT.**